RAWLS, Chief Judge.
Plaintiff Continental Casualty Company appealed from judgments based upon two jury verdicts, one against the plaintiff and in favor of defendant Raymond Diehl and the other in the sum of $37,500 in favor of plaintiff and against Mr. and Mrs. Red-dick and Virgil Reddick Mechanical Contractors, Inc.
The two main questions'involved in this appeal' are: 1. Whether the defense of prevention of performance of the special indemnity contract is applicable in this case. 2. Whether the trial judge erred in denying attorney’s fees to the plaintiff-appellant.
Bear Construction Company was awarded the contract to build the Florida'A. & M. Health and Physical Education Building. It subcontracted the plumbing, heating, and air conditioning to Virgil Reddick Mechanical Contractors, Inc., for the sum of $164,-763.00. Performance bond in this amount was issued June 11, 1962, to the Reddick corporation by Continental Casualty Company through its local agent, Midyette-Moor. As part consideration therefor Raymond Diehl, and Mr. and Mrs.,Reddick, as individuals, executed Special Indemnity Agreements agreeing to hold Continental harmless from any loss in connection with the project. Reddick had agreed that all materials and equipment for carrying out the subcontract would be purchased from Diehl’s firm, Big Bend Supply Company.
The Reddick firm undertook performance of the subcontract and before the same was completed, Reddick defaulted. Diehl voluntarily supervised the job for about 10 days until Mr. Midyette, Sr., advised him to let the job default. This was done and Reddick on April 17, 1963, formally notified Bear that he forfeited the contract. Notice was given to Continental Casualty Company which on April 23, 1963, notified indemnitor Diehl that he would be held to his special agreement to save Continental harmless.
Raymond Diehl testified that he called Payne Midyette, Sr., as agent for Continental, and requested that he be allowed to complete the contract. Diehl’s testimony was that Midyette told him that he would need a $50,000 bond before he would be permitted to complete the project. Diehl asked Midyette if he would bond him, and Mid-yette said, “No.” Midyette denied that such a telephone conversation ever took place.
On April 24, 1963, Continental Casualty Company’s claims supervisor wrote in a file memorandum: “The fact that Mr. Diehl or one of his enterprises has come forward with the thought that he or it should complete the contract, forming a contract with Continental Casualty Company, was brazen indeed. Nonetheless, we have apparently indicated to Mr. Diehl that we did not have the least hesitancy about accepting any reasonable bonded proposal. Mr. Diehl has apparently been inspired to attempt to raise $55,000 so as to obtain the completion bond necessary to finish this job. It is with glee that I await with open palm the efforts of Mr. Diehl to raise $50,000. Upon immediate payment, this would doubtless make us whole.”
Shortly thereafter, Raymond Diehl, Sr.; his son, Raymond Diehl, Jr.; his office manager, Tommy Corbett; and his attorney, Mr. Douglass met with Mr. Midyette, Sr., in his office and requested that Diehl be allowed to complete performance of the contract and requested that Continental either provide financing or help Diehl secure adequate financing to complete the project. They pointed out that Diehl had 38 years experience in the mechanical contracting business and could complete the contract cheaper than anyone else. The offer was refused. Diehl’s answers to interrogatories indicated that he had made one offer conditional upon Continental’s financing and another unconditional offer in Midyette’s office in the presence of his son, attorney and Corbett. The trial judge stated that the discrepancy was explained.
Diehl was never called upon to complete the subcontract. Instead Lawrence F. Gall-. man, Continental’s agent, decided that Con *241 tinental would complete the job as its own contractor. The job was completed at a total cost of about $109,000.00 — $56,226.15 more than was due under the terms of the subcontract.
Continental Casualty Company then brought this action to hold the indemnitors liable. Diehl pleaded that the special indemnity agreement was breached and abandoned, and the terms thereof waived, by Continental when it prevented him from completing the subcontract.
The jury returned a verdict in favor of Diehl and one against the Reddicks and their firm in the sum of $37,500.00.
We find no error in the trial judge’s holding that Diehl agreed to save the surety harmless by performing the contract in the event Reddick defaulted. The Special Indemnity Agreement, drafted by Continental Casualty Company, provided that “the In-demnitor will perform all the conditions of said bond.” The bond provided that the principal shall “keep, do and perform, each and every, all the singular, the matters and things in said contract.” Should there be any doubt that the trial jrtdge’s construction is correct, such doubt is alleviated by the explicit terms of paragraph 8 of the Special Indemnity Contract. This paragraph provides that if the indemnitor (Diehl) is “unable to complete or carry on any contract covered by the suretyship,” the in-demnitor thereby assigns to the Surety all his right, title and interest in any tools, equipment and materials on the job site, to any materials purchased for the job and stored elsewhere, to his rights in any subcontracts pertaining thereto, and to any payments due at the time of the indemnitor’s default.
The surety next contends that Diehl’s only offer to perform was a conditional one, and that Diehl’s testimony was so conflicting as to be unworthy of belief in that it varied with the interrogatories as to when an unconditional offer to perform occurred. As noted above the trial judge found that the inconsistency was explained. The undisputed evidence shows that immediately after Reddick’s default, the Surety solicited bids from other contractors and an estimated cost of completion from Diehl, but Continental Casualty Company never entertained the idea of permitting Diehl to complete the contract. On the contrary, through its agents, it either conditioned his performance of the contract upon his obtaining a $50,000 bond, or it willingly permitted him to labor under the belief that such a counteroffer had been made, although the Special Indemnity Agreement did not require such a bond of indemnitor and in fact specified that no security was given for performance of same. In this respect we also note that Diehl was never requested to complete the job, and all efforts on his part were rejected from the beginning, even when Diehl voluntarily began supervising the job after Reddick had walked off. Under these facts we find no error in applying the doctrine of prevention of performance. 7 Fla.Jur., Contracts, Section 145. Though there was conflicting evidence, the jury was properly instructed to find for Diehl only if they found that he was ready, willing and able to perform the contract but was prevented from doing so by Continental.
As to attorney’s fees the trial judge found that the section of the Special Indemnity Agreement which allowed attorney’s fees related to fees incurred in defending claims filed by third parties and did not pertain to an action brought on the agreement. Reading the section as a whole, we agree.
After carefully considering all other points urged in the appeal, we find that appellant has failed to clearly demonstrate the existence of any reversible error.
Affirmed.
WIGGINTON and CARROLL, DON-' ALD K., JJ., concur.